IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ARIANA GEORGE AND RODNEY BOONE, INDIVIDUALLY AND AS REPRESENTATIVES OF THE ESTATE OF AMARI BOONE, DECEASED | § § § § § § | |
| PLAINTIFFS, | § § § | |
| VS. | § § § § | CIVIL ACTION NO. 3:22-CV-1124 |
| ACH CHILD AND FAMILY SERVICES, SHELIA ROBERSON, CHAISITY FRIDA–CARO, JALAH LAWRENCE, GOVERNOR GREG ABBOTT, IN HIS OFFICIAL CAPACITY OVER THE TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, AND COVENANT KIDS, INC. D/B/A CK FAMILY SERVICES | § § § § § § § § § § § | |
| DEFENDANTS. | § | |

---

## PLAINTIFFS' SECOND AMENDED COMPLAINT

---

1.      Amari Boone no longer has a voice. His voice is gone because the organizations entrusted with screening, selecting, and monitoring his temporary foster care placement cut corners, ignored the obvious, refused to show up, and kept haphazard records. His voice is gone because the Texas Department of Family Protective Services continued to operate under policies and procedures that a judge found violated the civil rights of

children like Amari five years before Amari's death. His voice is gone because Covenant Kids Inc. ("CK Family Services") did less than the bare minimum when screening the unlicensed foster parents before it recommended placing Amari in their care. And his voice is gone because the private organization that Texas paid to manage foster care allowed the dangerous practices of its predecessor continue.

2.       That private organization — **our community. our kids** — knew what it took to protect Amari against violence and abuse.[1] In fact, it was supposed to be the example of doing just that after becoming the pilot program for private foster care in 2014. Afterall, in the six years leading up to Amari's death, it received between $80 and $92 million from its contract with Texas to bring foster care up to the *minimum level* required by Texas and required by the United States Constitution.

3.       Broken bones, bruises, and facial lacerations are just some of the physical injuries Amari suffered before his death while placed with his new foster parents. There were voices speaking up for Amari while he was still alive. Amari's Court Appointed Special Advocate. Amari's daycare director. Amari's mother. Amari's father. Neighbors. These people all made abuse and neglect reports about Amari's foster parents to our community. our kids. They spoke out for nearly two months, only to be disregarded and ignored at every level.

4.       Amari Boone suffered blunt force trauma to his head and was pronounced dead

---

[1] ACH Child and Family Services calls its community based care division is called **our community. our kids.** and this Complaint does the same.

at 1:19 AM, on April 12, 2020. He was only three years old. The investigation into his death revealed deadly practices by our community. our kids. and its employees— Shelia Roberson, Chaisity Frida–Caro, and Jalah Lawrence. It shone light on DFPS's continued civil rights violations and subcontractor CK Family Services' inadequate foster home safety screening.

5.      They saw. They heard. They refused to act. Now, Amari's parents must act as his voice. They bring this lawsuit on his behalf asking for answers and asking these Defendants to accept responsibility.

## **FACTS**

### **Texas and its Forgotten Children**

6.      "They are everybody's children, and nobody's children. They are the forgotten children in the Texas foster care system." Texas Comptroller Carole Keeton Strayhorn opened her office's special report— FORGOTTEN CHILDREN —with that sentence more than fifteen years ago. The report resulted from the Comptroller's investigation into the Texas foster care system and the agency responsible for it, the Department of Family and Protective Service. It gave children in Texas foster care a voice and argued for increased privatization.

7.      At that time, Child Protective Services used a "dual system" with state-run and private outsource components. On the state-run side, foster families and group homes contracted directly with the DFPS. Those families and group homes were directly recruited and trained by CPS employees. Private contractors provided emergency

shelters, residential treatment centers, and private child pacing agencies that handled their own recruiting and training. The FORGOTTEN CHILDREN investigation took a deep look into CPS's dual system and how CPS used the $1.5 billion in funds it received in 2003.[2] The problems it discovered were many. Inadequate licensing standards. Ineffective licensing investigations. Heavy caseloads and high caseworker turnover. Required face-to-face visits not being done. Missed red flags. It found the quality of care provided in state-run foster care and private foster care differed drastically. Those differences led to a recommendation that the system move towards privatization. In other words, place licensing and investigation into the hands of the state and use private contractors to provide case management.

8.      The journey away from the dual care system was slow. Reports of neglect, abuse, and endangerment continued. In 2011, a class action lawsuit was filed on behalf of Texas foster care children in the United States District Court for the Southern District of Texas. It pointed to numerous structural deficiencies in the dual system that were putting foster children at an unacceptable risk of harm, including abuse and neglect. Children were suffering maltreatment at an unacceptable rate. The call for action grew louder among Texans and advocacy groups, and the door of opportunity for private contractors began to open wider.

**Texas's Privatization Pilot Program: our community. our kids.**

---

[2] FORGOTTEN CHILDREN, Chapter 1: The Texas Foster Care System at 3.

9.      As problems continued to plague the dual system, Texas decided to test privatization using a pilot program that turned over care responsibilities to a private provider and kept case management responsibilities with the state. **our community. our kids.** was one of several organizations that vied for the lucrative contract. It became the pilot program Single Source Continuum Contractor (SSCC) in January 2014.

10.     Texas's contract with **our community. our kids.** covered a three-year period from 2014 to 2017. It arranged to pay **our community. our kids.** between $35 million and $45 million depending on the number of kids taken into foster care. As it would turn out, **our community. our kids.** would spend all of that money and $6 million more setting up the pilot program's infrastructure. The net loss wasn't a surprise to the organization that had always recognized that selling Texas on **our community. our kids.**'s Community-Based Care expertise would be a huge long-term revenue source.

11.     And sell itself it did. In terms of timing, **our community. our kids.** had positioned itself perfectly. The 2011 class action lawsuit filed against Texas's DFPS went to trial in December 2014. The evidence against Texas for its past deeds was strong, and the December 2015 verdict against Texas gave the privatization movement more momentum. Advocates and supporters of privatization, including **our community. our kids.**, were ready when the Foster Care Redesign bill was filed the next legislative session.

12.     By the time the 2017 Texas legislative session began, **our community. our kids.**'s contract had been extended another three years to August 2020. The

organization had received nearly $92 million in funding as of March 31, 2017. Wayne Carson, the Chief Operating Officer of the parent organization for **our community. our kids.**, testified in favor of the bill before the Senate Health and Human Services Committee claiming giving the organization control over case management in addition to placement services would allow it to do a better job caring for children. Others cautioned that extending privatization to case management created a serious conflict of interest.

13.     The law eventually passed. Carson gave an interview to Voyage Dallas Magazine that was published in December 2017. When asked what his organization did best, what set it apart from its competitors, Carson answered:

> *No one else in north Texas offers the variety of services that a family can find at ACH. In 2014, another opportunity presented itself to us. The state of Texas had developed a plan to improve the foster care system in Texas and they were looking for an agency to lead the initial effort to start the new program, called Community Based Foster Care. ACH stepped up, despite the funding being inadequate to perform high quality services, and we have successfully implemented the model in a 7 county area in north Texas.*[3]

---

[3]    Voyage Dallas, *Meet Wayne Carson of ACH Child and Family Services*, http://voyagedallas.com/interview/meet-wayne-carson-of-ach-child-and-family-services/ (last visited March 29, 2021).

14.     Sadly, **our community. our kids.** was not matching those words of reassurance with its deeds. In March 2018, the State Auditor's Office issued its *Audit Report on Foster Care Redesign at the Department of Family and Protective Services*.[4] The audit revealed significant problems with documentation, monitoring, and implementation of quality improvement plans for foster families the organization was supposed to be monitoring:

> Foster care provider did not receive ACH monitoring for more than eighteen months, and during that time children were placed with that foster care provider.
>
> ACH paid two foster care providers and placed fifteen children in their care without performing required monitoring for over two years.
>
> ACH generally  followed up on corrective action plans for two of twelve providers that required corrective action. Documentation was incomplete.
>
> ACH didn't check its employees' onsite visit reports to make sure the reports were complete and complied with ACH's policies.

15.     When it came time for the 2019 Texas Legislature to consider expanding and increasing funding for Community-Based Care, CEO Wayne Carson acted as an advocate for the new legislation in the media. He offered more assurances of his organization's capabilities to take over case management responsibilities to Texas Monthly Magazine. In a March 2019 article titled— *As Texas Privatizes Child Protective Services, Will the Horror Stories Go Unheard?* — Carson boasted about his organization's ability to handle case management and handle it better:

---

[4] Tex. State Auditor's Office, *SAO 18-022, Foster Care Redesign at the Department of Family and Protective Services* (Mar. 2018).

*Now, we're kind of the quarterback. We know what the needs are, and we can connect people in ways that are difficult more remotely from Austin.*

16.   Texas used a staged plan to transition case management responsibilities to SSCC providers. Entrusting **our community. our kids.** to provide direct case management and contact with Amari's foster parents did not excuse DFPS from protecting Amari's constitutional rights. The agency was and still is in charge of licensing, investigations, and operational oversite. Professional standards required DFPS to spot private contractor non-compliance, inspect contractor performance, and investigate the child abuse and neglect reports made to the agency itself. Sadly, for Amari and his family, DFPS substantially departed from those minimum professional standards.

17.   Amari Boone not only deserved to be protected against violence and abuse while away from the family where he belonged, he had the United States constitutional right to be. The conclusion of United States District Judge Janis Graham Jack's December 17, 2015 verdict against DFPS is clear:

> **VI.   CONCLUSION**
>
> Texas's foster care system is broken, and it has been that way for decades.  It is broken for all stakeholders, including DFPS employees who are tasked with impossible workloads.  Most importantly, though, it is broken for Texas's PMC children, who almost uniformly leave State custody more damaged than when they entered.

18.   On March 1, 2020, **our community. our kids.** became the first SSCC to take over

case management of foster care and kinship placements. It told Texas it had the right people, systems, and training in place to do the job. The circumstances of Amari Boone's death under **our community. our kids.**'s case management <u>just forty days later</u> proves nothing could be further from the truth.

**Amari Boone's Horror Story**

19.     A black Toyota Corolla pulled into Cook Children's Medical Center's ambulance bay at 8:22 am on Friday, April 10, 2020. The driver exited, removed a small child from the backseat, and entered the emergency room waiting area with the child in his arms. What hospital personnel saw in those first moments sent the pediatric emergency department's medical team into immediate action. They recognized the small boy was near death.

20.     That little boy's name was Amari Boone. He was just three years old. The man driving the car was one of the two foster parents with whom Amari and his little brother had been placed less than three months earlier. Amari Boone arrived at the emergency room in respiratory failure. He required immediate intubation because his blood oxygen levels were so low. His body showed physical signs of severe brain injury, including posturing (abnormal rigid body movement) and bright red blood in his right ear canal. Evidence of visible bodily contusions appeared on Amari's upper right arm. Within an hour, test results confirmed Amari Boone was suffering from a severe brain injury.

21.     Less than two hours after arriving at the emergency room, the specialists at Cook Children's concluded that Amari could not survive his injuries. They ordered a skeletal

survey using a series of x-rays to document additional evidence of child abuse. Both child protective services and local police received calls reporting the evidence Amari was dying because of the abuse he sustained while in the kinship placement our community. our kids. and its employees were supposed to be monitoring.

22.     In the early morning hours of April 12, 2020, Amari's critical care doctor joined Amari's parents at Amari's bedside in the Pediatric ICU. They watched as the doctor performed a second brain death examination on their three-year-old little boy. The doctor had already talked to them about brain death and its implications, so Amari's parents knew that a second exam confirming brain death meant their Amari was lost. Amari's death certificate identified his manner of death as homicide as the result of blunt force trauma of the head. The skeletal scan taken at Cooks and his autopsy confirmed Amari's time living in that fictive kin placement had been filled with systematic physical abuse. Abuse that DFPS and CK Family could have prevented. Abuse our community. our kids. and its employees ignored.

**Amari Boone Didn't Have to Die**

23.     Amari Boone's death was 100 percent preventable. The Department of Family Protective Services could have prevented the tragedy. CK Family Services could have prevented the tragedy. And our community. our kids and its employees Shelia Roberson, Chasity Frida-Caro, and Jalah Lawrence could have prevented the tragedy. Roberson, Frida-Caro, and Lawrence were all employees of DFPS prior to our community. our kids taking over case management responsibilities in March 2020.

24.     During the time DFPS employed each of them, DFPS was responsible for training, supervising, and monitoring Roberson, Frida-Caro, and Lawrence's job performance. It was responsible for training Roberson, Frida-Caro, and Lawrence to watch for signs of neglect and abuse, maintain thorough documentation, adhere to state laws, follow through on any reports or concerns, communicate with caregivers, and when/how to conduct face-to-face home visits. It was also responsible for monitoring each of its employees' work performance and compliance with the law as well as DFPS policies and procedures. Based on the acts and omissions each of these former DFPS employees described above, DFPS knew or should have known the individuals were not properly trained and/or complying with DFPS standards or Texas law. Nonetheless, DFPS recommended each of them for employment at our community. our kids.

25.     DFPS became Amari's Permanent Managing Conservator in November 2019. It was ordered by the family court to conduct an expedited home study for Deondrick Foley (a non-licensed foster parent) by November 27, 2019 so long as Foley passed criminal and CPS background checks. Shelia Roberson, then employed by DFPS and assigned by DFPS as Amari's case worker participated in the proceedings and evaluating the safety of placing Amari in Foley's care.

26.     The home study wasn't completed until December 2019. DFPS hired CK Family Services to perform the home study on Deondrick Foley and his live-in boyfriend Joseph Delancy. The assessment revealed Delancy had prior criminal history and that the couple had very little experience caring for young children. It also revealed both men worked

and only had one car to use as transportation for the entire household. On information and belief, CK Family Services only interviewed Foley and Delancy as a couple on one occasion and did not perform separate individual interviews required by law prior to recommending the two men as safe fictive. If such interviews were conducted, neither the timing or matters discussed were documented and provided to DFPS. our community. our kids. was also involved in Amari's placement with Foley and Delancy.

27.     Shelia Roberson was working for DFPS and actively participated in placing Amari in the care of Deondrick Foley and his boyfriend Joseph Delancy on January 27, 2020. At that time, Roberson had known Amari for some time as a DFPS caseworker. Roberson was supposed to be his protector and the guide that saw him through his new placement with these fictive kin.

28.     On February 18, 2020, Shelia Roberson, Amari, and Deondrick Foley (Amari's "fictive kin") attended a permanency hearing in court. Roberson didn't document anything about the hearing—including the fact that the hearing even happened—in Amari's file. During the hearing, there was a discussion about Amari having a leg injury. Due to Roberson's failure to document the event, the identity of who brought the injury to Roberson's attention and what was said about the injury during the hearing are both unknown. As a result of whatever was discussed, Roberson told Deondrick Foley that Amari needed to be evaluated at Cook Children's Hospital. Amari's case file is devoid of any mention of Roberson ever following up to make sure Amari received medical care or check the status of his injury.

29.     That day, just weeks into the placement, Amari Boone went to Cook Children's for the *first* time. That day, weeks into the placement, doctors at Cook Children's diagnosed Amari with a *fractured pelvis*. The fracture was still healing when Amari died according to the skeletal scan taken at that time: "Healing bilateral superior pubic ramus fractures. Probably the superior pubic ramus fracture on the left was present on a pelvis exam from 02/18/2020 in retrospect and questionably the 1 on the right."

30.     Shelia Roberson *didn't include any* information about that critical hospital visit or the results of the hospital visit in Amari's case file. And Roberson did not follow up with the fictive kin or do anything else for Amari until sometime after March 1st. In other words, Roberson sent a three-year-old child just weeks into a new placement to the hospital from a court healing and did nothing to find out what happened. Roberson was employed by DFPS when Amari's fractured pelvis was discovered. She began her employment with our community. our kids. on March 2, 2020 and continued managing Amari's case.

31.     On March 7, 2020, Amari got to see his parents. What his mother and father saw that day made them scared. The bruises on his body were clear. Ariana suspected abuse. She started taking pictures and she refused to let Amari go back to the fictive kin. Foley's boyfriend, Joseph Delancy, called the police about the situation. Shelia Roberson's bosses at our community. our kids., Director Jalah Lawrence and supervisor Chaisity Frida–Caro got involved. Instead of reviewing the pictures Ariana had taken or visiting in person, the managers did nothing.

32.     Ariana sent the pictures of the bruises and markings on Amari's body to Shelia Roberson that day. Roberson uploaded them into Amari's case our community. our kids. case file the next day. Instead of identifying Ariana as the photographer, Roberson identified herself as the photographer. She instructed Amari's fictive kin to take him to Cook Children's *again* to be evaluated.

33.     Neither of Shelia Roberson's bosses at our community. our kids., Director Jalah Lawrence or Supervisor Chaisity Frida–Caro, followed up on the situation. They did not even make sure Amari's our community. our kids. case manager went to visit Amari in person to assess his situation. Stated differently, our community. our kids. sold itself to Texas as the organization that could do case management better. Yet, it did nothing to make sure someone from its organization went to and checked on Amari Boone in person following a report of suspected abuse.

34.     Amari's fictive kin took him to Cook Children's for the *second* time in less than a month on March 8, 2020. According to Amari's case file, Shelia Roberson had a conversation with Amari's fictive kin the next day and told him she received the medical records from Amari's *second* hospital visit. *Again*, the records weren't placed in Amari's case file and the results weren't documented.

35.     Three days later on March, 11, 2020, Amari's Court Appointed Special Advocate (CASA) made a home visit. She observed such concerning behavior between Amari and his fictive kin and that she reported it to the Texas Abuse Hotline. The CASA reported that the foster parents didn't allow Amari to drink anything and that one of them

grabbed Amari's arm roughly. Then, she called Shelia Roberson to share the same information.

36.      The our community. our kids. case manager responded with anger. Her anger was not directed at Amari's fictive kin. It was directed at Amari's CASA advocate for reporting her observations to the Texas Abuse Hotline. Shelia Roberson ranted and raved on the call and acted defensive. Sadly, but not surprisingly, Roberson did not document the March 11, 2020 call in Amari's case file. Sadly, but not surprisingly, our community. our kids. did not check in on Amari or his case manager's documentation either.

37.      On April 3rd, 2020, Shelia Roberson, Director Jalah Lawrence, and Supervisor Chaisity Frida-Caro, the three our community. our kids. employees, discussed Amari's case. They decided Amari would need to be removed if anything else happened because of all the events that had occurred in the previous 30 days. Yet three days later on April 6, 2020, Shelia Roberson documented a message from the fictive kin letting her know that Amari had a swollen eye. Roberson a picture of Amari's eye. The picture showed obvious swelling going from Amari's right ear to his right eye. Roberson documented what she saw as "allergies". She did not make a home visit to see the injury in person.

38.      Four days later, on April 7, 2020, Roberson got a message that Amari would not be at daycare that day. Going to daycare on weekdays was an essential part of Amari's kinship placement plan and Roberson had already had to talk to Amari's foster parents about days missed from daycare. No home visit happened.

39.      The *same thing* happened the next day, according to Shelia Roberson's limited

documentation. Yet, again, no home visit happened.

40.     On April 9th, 2020, the director of Amari's daycare sent Roberson a message and a photograph of Amari. Roberson documented getting a message and a picture but *did not* record the contents of the message. The daycare director spoke with Roberson over the phone that day. The daycare director told the our community. our kids. case manager something was off with Amari and that he didn't seem right. The phone conversation is not in Amari's case file. However, Roberson did make sure to record something about allergy medication. During the investigation into Amari's death, investigators took a look at the picture from daycare and noted that they saw visible swelling on the right side of the child's face *and additional large swelling to his right forehead with a linear contusion.*

41.     The next morning, on April 10, 2020, the driver of a black Toyota pulled into the ambulance bay of Cook Children's with the child DFPS, CK Family Services, and our community. our kids. promised to protect clinging to life. Had these organizations done what they promised Texas they would do, Amari Boone would still be alive.

## **PARTIES**

42.     Defendant ACH Child and Family Services is a domestic nonprofit corporation doing business in the State of Texas. The division of ACH Child and Family Services involved in Community-Based Care as a Single Source Continuum Contractor is known as **our community. our kids.,** but that division is operated and controlled by ACH Child and Family Services. ACH Child and Family Services has been served and is properly

before the Court.

43.     Defendant Jalah Lawrence is an individual who resided in Tarrant County, Texas at the time that gave rise to the causes of action at issue in this case. She has been served and is properly before the Court.

44.     Defendant Chaisity Frida–Caro is an individual who presently resides in Dallas County, Texas and resided in Dallas County, Texas at the time that gave rise to the causes of action at issue in this case. She has been served and is properly before the Court.

45.     Defendant Shelia Roberson is an individual who resided in Tarrant County, Texas at the time that gave rise to the causes of action at issue in this case. She has been served and is properly before the Court.

46.     Defendant Greg Abbott is the Governor of Texas, and he is sued in his official capacity. He is responsible for ensuring that all Texas agencies comply with the applicable federal and state law. He oversees the activities of the Texas Department of Family Protective Services, pursuant to the TEXAS CONSTITUTION, Article IV, Sections 1 and 10 and TEXAS GOVERNMENT CODE, Title 4, Chapter 531. He has been served and is properly before the Court.

47.     Defendant Covenant Kids, Inc. d/b/a CK Family Services is a domestic nonprofit corporation doing business in the State of Texas. It is a resident of Tarrant County, Texas. Covenant Kids, Inc. d/b/a CK Family Services can be served through its registered agent William A. Lund at 4807 Misty Wood Court, Arlington, Texas 76017 or wherever it may be found. It has been served and is properly before the Court.

48.     Plaintiff Ariana George is the natural mother of both Amari Boone, deceased. Ariana resides in Tarrant County, Texas. She brings this case in her individual capacity and as a representative of the Estate of Amari Boone.

49.     Plaintiff Rodney George is the natural father of both Amari Boone, deceased. Rodney resides in Tarrant County, Texas. He brings this case in his individual capacity and as a representative of the Estate of Amari Boone.

## JURISDICTION AND VENUE

50.     This Court has subject matter jurisdiction over the claims against DFPS pursuant to 28. U.S.C. § 1331 which gives federal district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

51.     This Court also has subject matter jurisdiction over the claims against DFPS pursuant to 28 U.S.C. § 1343 which gives federal district courts jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of a person's civil rights.

52.     This is also an action to redress the deprivation of Amari Boone's constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to

42 U.S.C. § 1983.

53.     This Court also has supplemental jurisdiction over the state law claims against Defendants under 28 U.S.C. § 1367.

54.     Venue is proper in this District and this Division pursuant to 28 U.S.C. § 1391 since Defendant Frida-Caro resides in Dallas County, Texas, and venue to one is venue to all.

## NO CHARITABLE IMMUNITY OR LIMITATIONS ON LIABILITY

55.     Neither **our community. our kids.** nor its employees are entitled to immunity under TEXAS CIVIL PRACTICES & REMEDIES CODE Chapter 84 or TEXAS FAMILY CODE § 264.174. At all relevant times, as described above and based on the evidence Plaintiffs anticipate developing throughout this action, the acts and omissions of **our community. our kids.** and its employees were willfully negligent and done with conscious indifference or reckless disregard for the safety of Amari Boone.

56.     Neither CK Family Services nor its employees are entitled to immunity under TEXAS CIVIL PRACTICES & REMEDIES CODE Chapter 84 or TEXAS FAMILY CODE § 264.174. At all relevant times, as described above and based on the evidence Plaintiffs anticipate developing throughout this action, the acts and omissions of CK Family Services and its employees were willfully negligent and done with conscious indifference or reckless disregard for the safety of Amari Boone.

## CAUSES OF ACTION

**Count One**
**Negligence Per Se Against our community. our kids.**

57.     Plaintiffs' negligence per se claim is based on the statutes identified and the facts set out in this Complaint.

58.     At all relevant times, Texas imposed statutory duties on **our community. our kids.** that were designed to specifically protect children receiving child protection services from Single Source Continuum Contractors.

59.     TEXAS FAMILY CODE § 264.161 entitled *Statutory Duties Assumed by Contractor*, provides:

> Except as provided by Section 264.163, a single source continuum contractor providing foster care services and services for relative and kinship caregivers in a catchment area must, either directly or through subcontractors, assume the statutory duties of the department in connection with the delivery of foster care services and services for relative and kinship caregivers in that catchment area.

60.     As it relates to Amari Boone, **our community. our kids.** violated the following statutory and regulatory duties imposed on it as a Single Source Continuum Contractor providing Community-Based Care:

   a.     Provide training, including training in trauma-informed programs and services, to caseworkers and supervisors. TEX. FAM. CODE § 264.015(a).

   b.     Provide and comply with the Foster Child Bill of Rights under federal and state law and policy to:

   (1)     protect children from abuse, neglect, exploitation, discrimination, and harassment,

   (2)     ensure access to adequate food, clothing, shelter, and education,

   (3)     ensure timely access to necessary medical and mental health

services,

    (4)    ensure contact and communication with caseworkers, attorneys ad litem, guardians ad litem, and court-appointed special advocates, and

    (5)    all other protections set out in the Foster Child Bill of Rights that ensure all case management actions are in the best interest of the child.

    *See* TEX. FAM. CODE § 264.008(b).

c.    Develop and implement a policy for receiving and handling reports that the rights of children in kinship placements are not being observed. TEX. FAM. CODE § 264.008(c).

d.    Ensure any child under the single source continuum contractor's care receives any necessary emergency medical care as soon as possible. TEX. FAM. CODE §§ 264.1076, 266.009.

e.    Provide services designed to prevent abuse and alleviate the effects of any abuse suffered. *See* TEX. FAM. CODE § 264.201.

f.    Provide the direct delivery and coordination of a network of formal and informal activities within its catchment for family-based safety services and case management services, including:

    (1)    caseworker visits with the child and all caregivers,

    (2)    family visits,

    (3)    family group counseling and family group decision-making,

    (4)    development of the family plan of services,

    (5)    monitoring, developing, securing, and coordinating services;

    (6)    evaluating the progress of children, caregivers, and families receiving services,

(7)    assuring that the rights of children, caregivers, and families receiving services are protected, and

(8)    any other function or service that the department determines is necessary to allow a single source continuum contractor to assume responsibility for case management.

*See* TEX. FAM. CODE § 264.169.

g.    Provide protective services to children, including protection from alleged abuse and neglect in kinship placements and implement/manage programs to provide early intervention in situation where a child is at-risk for child abuse. TEX. HUM. RES. CODE § 40.002.

h.    Institute and utilize recruitment of qualified case managers with an emphasis specified education credentials. TEX. HUM. RES. CODE § 40.0326.

i.    Develop and implement adequate training programs for each employee newly hired or promoted to a management position with haste. TEX. HUM. RES. CODE § 40.037.

j.    Balance measures aimed at protecting child safety with federal and state requirements related to normalcy and decision making under the reasonably prudent parent standard prescribed by 42 U.S.C. § 675 and TEXAS FAMILY CODE §§ 264.001, 264.125. *See* TEX. HUM. RES. CODE § 40.043.

61.    Amari Boone was within the exact class of people these statutes were intended to protect. As provided by TEXAS FAMILY CODE § 264.151(a), "The services provided by [SSCCs] must include direct case management to ensure child safety, permanency, and well-being, in accordance with state and federal child welfare goals."

62.    The statutory violations of **our community. our kids.** by its own acts and omissions as well as the acts and omissions of its employees for whom it is vicariously

liable proximately caused Plaintiffs' injuries.

63.     Plaintiffs seek damages for **our community. our kids.**'s negligence per se.

**Count Two**
**Negligence Against our community. our kids.**

64.     Plaintiffs' negligence claim is based on the facts set out in this Complaint.

65.     At all relevant times, **our community. our kids.** exercised actual control in providing recruitment, training, and monitoring of its employees and kinship placement caregivers. It exercised actual control over case management services that were supposed to be provided to Amari Boone while he was placed with fictive kin.

66.     Its responsibility over case management, employee training, and caregiver training to ensure child welfare in fictive kinship placements arises under federal and state law was well as **our community. our kids.**'s contractual arrangement with the Texas Department of Family and Protective Services.

67.     **our community. our kids.** represented itself and its subcontractors as having the "skills, qualifications, expertise, financial resources, and experience necessary to perform" required services for children and families navigating the State's foster care system. Those services included case management, case documentation, child safety, collaboration conferences, collaboration with DFPS, and consistent communication.

68.     Pursuant to 42 U.S.C. § 675, TEXAS FAMILY CODE §§ 264.001, 264.125, and TEXAS HUMAN RESOURCES CODE § 40.043, **our community. our kids.**'s owed Amari Boone and his parents a heightened duty of care. That standard— the "standard of care of a

reasonable and prudent parent"— means:

> . . . the standard of care that a parent of reasonable judgment, skill, and caution would exercise in addressing the health, safety, and welfare of a child while encouraging the emotional and developmental growth of the child, taking into consideration:
>
>> (A) the overall health and safety of the child;
>>
>> (B) the child's age, maturity, and development level;
>>
>> (C) the best interest of the child based on the caregiver's knowledge of the child;
>>
>> (D) the appropriateness of a proposed activity and any potential risk factors;
>>
>> (E) the behavioral history of the child and the child's ability to safely participate in a proposed activity;
>>
>> (F) the importance of encouraging the child's social, emotional, and developmental growth; and
>>
>> (G) the importance of providing the child with the most family-like living experience possible.

TEX. FAM. CODE § 264.001(5).

69.     Additionally, and alternatively, **our community. our kids.** owed Amari and his parents a duty of care to act as a reasonable Single Source Continuum Contractor would act under the same or similar circumstances. That duty required **our community. our kids.** to act in a reasonable manner, including but not limited to:

> a.     Hiring, supervising, and training its employees in case management, case file documentation, child abuse detection, child abuse prevention, child abuse reporting, and child abuse response,

b.     Timely, complete, and accurate case management documentation,

c.     Case management of children in kinship placements and fictive kinship placements,

e.     Maintaining consistent contact and communication with all participants in the child's services and life,

f.     Child abuse detection, prevention, reporting, and response, and

g.     Acting in all ways with a child's best interest in mind.

70.    The standard of care violations of **our community. our kids.** by its own acts and omissions as well as the acts and omissions of its employees for whom it is vicariously liable proximately caused Plaintiffs' injuries.

71.    Plaintiffs seek damages for **our community. our kids.**'s negligence.

**Count Three**
**Negligent Undertaking Against our community. our kids.**

72.    Plaintiffs' negligent undertaking claim is based on the facts set out in this Complaint.

73.    Pursuant to RESTATEMENT (Second) OF TORTS § 323, **our community. our kids.** undertook, for its pecuniary benefit, to control the methods, policies and procedures, and conditions of training, supervising, and providing case management services for the protection of Amari Boone while he was placed with fictive kin.

74.    Having assumed those duties, **our community. our kids.** acted negligently and unreasonably as set forth in the preceding counts and described in the fact section of this Complaint.

75.     Amari Boone died because of **our community. our kids.**'s failure to exercise reasonable care in fulfilling those duties. Amari Boone's parents lost their three year old little boy **our community. our kids.**'s failure to exercise reasonable care in fulfilling those duties.

76.     Further, **our community. our kids.**'s failure to exercise reasonable care in fulfilling those duties increased the risk of harm to Amari Boone, or in the alternative, Amari and his parents were harmed in reliance upon **our community. our kids.**'s failure to warn them of dangers known to it.

77.     **our community. our kids.**'s negligence in performing the duties it voluntarily undertook proximately caused Plaintiffs' injuries.

78.     Plaintiffs seek damages for **our community. our kids.**'s negligence in performing the duties it voluntarily undertook.

**Count Four**
**Negligence Per Se Against Employees of our community. our kids.**

79.     Plaintiffs' negligence per se claim against the employees of **our community. our kids.** is based on the statutes identified and the facts set out in this Complaint.

80.     At all relevant times, Texas imposed statutory duties on Shelia Roberson, Chaisity Frida–Caro, and Jalah Lawrence as employees of **our community. our kids.** Those duties were specifically designed to protect children receiving child protection services from Single Source Continuum Contractors.

81.     TEXAS FAMILY CODE § 264.161 entitled *Statutory Duties Assumed by Contractor*,

provides:

> Except as provided by Section 264.163, a single source continuum contractor providing foster care services and services for relative and kinship caregivers in a catchment area must, either directly or through subcontractors, assume the statutory duties of the department in connection with the delivery of foster care services and services for relative and kinship caregivers in that catchment area.

82.    As it relates to Amari Boone, **our community. our kids.** violated the following statutory and regulatory duties imposed on it as a Single Source Continuum Contractor providing Community-Based Care:

    a.    Provide training, including training in trauma-informed programs and services, to caseworkers and supervisors. TEX. FAM. CODE § 264.015(a).

    b.    Provide and comply with the Foster Child Bill of Rights under federal and state law and policy to:

        (1)    protect children from abuse, neglect, exploitation, discrimination, and harassment,

        (2)    ensure access to adequate food, clothing, shelter, and education,

        (3)    ensure timely access to necessary medical and mental health services,

        (4)    ensure contact and communication with caseworkers, attorneys ad litem, guardians ad litem, and court-appointed special advocates, and

        (5)    all other protections set out in the Foster Child Bill of Rights that ensure all case management actions are in the best interest of the child.

        *See* TEX. FAM. CODE § 264.008(b).

c.   Develop and implement a policy for receiving and handling reports that the rights of children in kinship placements are not being observed. Tᴇх. Fᴀᴍ. Cᴏᴅᴇ § 264.008(c).

d.   Ensure any child under the single source continuum contractor's care receives any necessary emergency medical care as soon as possible. Tᴇх. Fᴀᴍ. Cᴏᴅᴇ §§ 264.1076, 266.009.

e.   Provide services designed to prevent abuse, alleviate the effects of any abuse suffered. *See* Tᴇх. Fᴀᴍ. Cᴏᴅᴇ § 264.201.

f.   Provide the direct delivery and coordination of a network of formal and informal activities within its catchment for family-based safety services and case management services, including:

(1)   caseworker visits with the child and all caregivers,

(2)   family visits,

(3)   family group counseling and family group decision-making,

(4)   development of the family plan of services,

(5)   monitoring, developing, securing, and coordinating services,

(6)   evaluating the progress of children, caregivers, and families receiving services,

(7)   assuring that the rights of children, caregivers, and families receiving services are protected, and

(8)   any other function or service that the department determines is necessary to allow a single source continuum contractor to assume responsibility for case management.

*See* Tᴇх. Fᴀᴍ. Cᴏᴅᴇ § 264.169.

g.   Provide protective services to children, including protection from alleged abuse and neglect in kinship placements and implement/manage programs to provide early intervention in situation

where a child is at-risk for child abuse. TEX. HUM. RES. CODE § 40.002.

h.     Institute and utilize recruitment of qualified case managers with an emphasis specified education credentials. TEX. HUM. RES. CODE § 40.0326.

i.     Develop and implement adequate training programs for each employee newly hired or promoted to a management position with haste. TEX. HUM. RES. CODE § 40.037.

j.     Balance measures aimed at protecting child safety with federal and state requirements related to normalcy and decision making under the reasonably prudent parent standard prescribed by 42 U.S.C. § 675 and TEXAS FAMILY CODE §§ 264.001, 264.125. *See* TEX. HUM. RES. CODE § 40.043.

83.     Amari Boone and his parents were within the exact class these statutes were intended to protect. As provided by TEXAS FAMILY CODE § 264.151(a), "The services provided by [SSCCs] must include direct case management to ensure child safety, permanency, and well-being, in accordance with state and federal child welfare goals."

84.     The statutory violations of Shelia Roberson, Chaisity Frida–Caro, and Jalah Lawrence while in the scope of their employment with **our community. our kids.** proximately caused Plaintiffs' injuries.

85.     Plaintiffs seek damages for **our community. our kids.**'s negligence per se.

### Count Five
### Negligence Against CK Family Services

86.     Plaintiffs' negligence claim is based on the facts set out in this Complaint.

87.     At all relevant times, CK Family Services exercised actual control in providing recruitment, training, monitoring of its employees, and screening potential foster care

and kinship placement caregivers. It exercised actual control over these services that were supposed to be provided for the benefit of Amari Boone prior to his placement with fictive kin.

88.   Its responsibility over recruitment, training, monitoring of its employees, and screening potential foster care and kinship placement caregivers arises under federal and state law was well as its contractual arrangements with the Texas Department of Family and Protective Services.

89.   CK Family Services represented itself and its subcontractors as having the skills, qualifications, expertise, financial resources, and experience necessary to perform required supportive services for children and families navigating the State's foster care system. Those services included recruitment, training, monitoring of its employees, screening potential foster care and kinship placement caregivers, collaboration with DFPS, and consistent communication.

90.   Pursuant to TEXAS FAMILY CODE §§ 262.114, 264.201 ,264.1085 as well as other state and federal statutes, CK Family Services owed Amari Boone and his parents a heightened duty of care. That standard— the "standard of care of a reasonable and prudent parent"— means:

> . . . the standard of care that a parent of reasonable judgment, skill, and caution would exercise in addressing the health, safety, and welfare of a child while encouraging the emotional and developmental growth of the child, taking into consideration:
>
> (A) the overall health and safety of the child;

(B) the child's age, maturity, and development level;

(C) the best interest of the child based on the caregiver's knowledge of the child;

(D) the appropriateness of a proposed activity and any potential risk factors;

(E) the behavioral history of the child and the child's ability to safely participate in a proposed activity;

(F) the importance of encouraging the child's social, emotional, and developmental growth; and

(G) the importance of providing the child with the most family-like living experience possible.

TEX. FAM. CODE § 264.001(5).

91.     Additionally, and alternatively, CK Family Services owed Amari and his parents a duty of care to act as a reasonable foster caregiver assessment provider would act under the same or similar circumstances. That duty required CK Family Services to act in a reasonable manner, including but not limited to:

a.      Hiring, supervising, and training its employees in case management, case file documentation, child abuse detection, child abuse prevention, child abuse reporting, and child abuse response,

b.      Timely, complete, and accurate case management documentation,

c.      Thorough and competent assessment of children in kinship placements and fictive kinship placements,

e.      Maintaining consistent contact and communication with all participants in the child's services and life,

f.      Child abuse detection, prevention, reporting, and response, and

g.   Acting in all ways with a child's best interest in mind.

92.   The standard of care violations of CK Family Services by its own acts and omissions as well as the acts and omissions of its employees for whom it is vicariously liable proximately caused Plaintiffs' injuries.

93.   Plaintiffs seek damages for CK Family Services' negligence.

**Count Six**
**Negligent Undertaking Against CK Family Services**

94.   Plaintiffs' negligent undertaking claim is based on the facts set out in this Complaint.

95.   Pursuant to RESTATEMENT (Second) OF TORTS § 323, CK Family Services undertook, for its pecuniary benefit, to control the methods, policies and procedures, and conditions of training, supervising, and providing foster caregiver and home assessment services for the protection of Amari Boone while he was placed with fictive kin.

96.   Having assumed those duties, CK Family Services acted negligently and unreasonably as set forth in the preceding counts and described in the fact section of this Complaint.

97.   Amari Boone died because of CK Family Services' failure to exercise reasonable care in fulfilling those duties. Amari Boone's parents lost their three year old little boy CK Family Services' failure to exercise reasonable care in fulfilling those duties.

98.   Further, CK Family Services' failure to exercise reasonable care in fulfilling those duties increased the risk of harm to Amari Boone, or in the alternative, Amari and his

parents were harmed in reliance upon CK Family Services' failure to warn them of dangers known to it.

99.    CK Family Services' negligence in performing the duties it voluntarily undertook proximately caused Plaintiffs' injuries.

100.    Plaintiffs seek damages for CK Family Services' negligence in performing the duties it voluntarily undertook.

**Count Seven**
**Substantive Due Process Under the United States Constitution**
**Against Abbott in his Official Capacity Over DFPS**

101.    Plaintiffs' substantive due process under the United States Constitution claim is based on the facts set out in this Complaint.

102.    State officials assume affirmative duties under the Fourteenth Amendment to the United States Constitution to protect from harm all children taken into foster care custody, and to provide them appropriate care, treatment, and services through the exercise of accepted professional judgment. They further owed duties under the Fourth Amendment to protect Amari from the invasion of his bodily integrity and safeguard his privacy rights.

103.    At all relevant times, Defendant accepted federal funding authorized by the Spending Clause including but not limited to Title IV-A, Title IV-B, Title IV-E, Title XIX, and Title XX of the Social Security Act; and under PL 93-247. Those statutes created individual rights for these individual Plaintiffs. They were provided on the condition that the state comply with anti-discrimination prohibitions, public welfare protection, and public policy requirements. *See* 45 C.F.R. § 75.300.

104.    The rights established under those statutes were intended to benefit these Plaintiffs. For instance, the Adoption Act 42 U.S.C. §§ 622 and 671 provide for private rights to placement in foster homes or settings within national standards, individualized case plans, permanency placement goals, quality foster care services that protect health and safety, and receive services from a welfare system that has adequate information to

make informed decisions.

105.    Plaintiffs were subjected to removal and foster care placement. They were deprived of those rights. Such rights were not so vague or amorphous that enforcement would strain judicial competence. And, finally, the statutes are clear about the binding obligations they impose on states.

106.    Plaintiffs respectfully assert that the Civil Rights Act of 1871 (which contains § 1983) statutorily waives Eleventh Amendment sovereign immunity and argues that the line of cases reaching the opposite conclusion should be reconsidered due to misguided reasoning. To the extent such interpretations would be applied in this case, Plaintiffs argue that extension, modification, and/or reversal of such interpretations is necessary to bring the legal protection to civil rights victims and afford them meaningful civil remedies consistent with the intention of Congress *at the time of enactment*.

106.    For example, the 1871 Act was enacted to enforce the Fourteenth Amendment and expressly directed to the states which were unwilling to enforce due process rights of blacks guaranteed by the Fourteenth Amendment. At the time of its enactment, the "Dictionary Act" provided that the word "person" extended and applied to bodies politic and corporate. Act of Feb. 25, 1871, ch. 71, § 2, 16 Stat. 431, 431 (codified as amended at 1 U.S.C. § 1). As a result, the clear language of 42 U.S.C. § 1983 permitting private actions based on accepted plain meaning in place at the time of its enactment should be understood to include states within the definition of "person" as used by the statute.

107.    Defendant Abbott, in his official capacity, failed to discharge his affirmative duties

because his actions and inactions constituted state policies or practices that substantially depart from accepted professional judgment, practice, and standards as to demonstrate that state officials under Abbott's control: (1) did not base their conduct on such a judgment, and/or (2) acted in a manner that shocks the conscience and, thus, constituted deliberate indifference to the constitutionally protected rights and liberty and privacy interests of Amari Boone while in the State's primary managing conservatorship. More specifically, Plaintiffs complain of the following actions and inactions of this Defendant and state officials produced structural deficiencies in the State's foster care system that harmed Amari while the State was his primary managing conservator.

108.   At all times relevant, Texas employed an insufficient number of caseworkers to manage cases, including Amari Boone's case. Caseworkers are responsible for many of the critical tasks that Amari Boone and other children like him depend on: placing children in the least restrictive placements that are safe and meet their needs, regularly visiting children in those placements, ensuring the development and implementation of case plans needed Amari and children like him, ensuring children receive needed services; and developing and implementing a permanency plan for Amari to ensure that he left State custody for a safe permanent family, if possible.

109.   Professional standards, as promulgated by the Child Welfare League of America, require that caseworkers have caseloads that range from 12 to 15 children in order to fulfill their responsibilities, Standards of Excellence for Family Foster Care Services 3.48, and Texas state law requires that DFPS worker caseloads be consistent with

"professional caseload standards" which are defined to include caseload standards established by the Child Welfare League of America. Tᴇx. Gᴏᴠ'ᴛ Cᴏᴅᴇ §§ 531.001(5), 531.048(b)(3). Texas employed too few caseworkers to provide Amari Boone and other similarly situated children caseworkers whose caseloads meet professional standards during the relevant time period.

110.    As the State has acknowledged previously, workers are less able to fulfill their responsibilities and ensure the safety of the children in their care, as required by Texas state policy and professional standards, when they carry excessive caseloads. For example, children whose workers carry excessive caseloads are harmed by and put at risk of harm by placement decisions made without adequate information. On information and belief, excessive caseloads caused Amari, to experience placements not suited to his needs, frequent and repeated moves from one placement to another, and maltreatment and a higher risk of maltreatment in the care of his fictive kin.

111.    The State's actions and inactions set out in this Complaint put Amari Boone at a risk of harm, which ultimately came to fruition.

112.    The State's actions and inactions set out in this Complaint deprived Amari Boone of the substantive due process rights conferred on him by the Fourteenth Amendment to the United States Constitution, including the right to be reasonably safe from harm while in government custody and the right to receive the most appropriate care, treatment, and services determined and provided through the exercise of accepted professional judgment.

113.    Additionally, at all relevant times, Texas failed to require that kinship and fictive kinship homes be licensed or verified.  Under Texas policy and practice at the time of these events, a kinship or fictive kinship caregiver for a child in State custody was not required to be licensed or verified as a foster parent. Accepted professional standards require that such kinship and fictive kinship homes meet the same standards as a licensed or verified foster home.

114.    Unverified kinship and fictive kinship providers, at all relevant times, did not receive necessary training. Under Texas policy and practice at the time of these events, unverified kin and fictive kin providers did not receive the same training for the care of children in State custody that was provided to licensed and verified foster parents. Accepted professional standards recognize that all kin providers should undergo such training for the care of children.

115.    By the actions and inactions of the State and state officials set out in this Complaint, Amari Boone was subjected to a continuing risk of harm that ultimately came to fruition.

116.    The State's actions and inactions set out in this Complaint, were a substantial factor leading to and proximate cause of the violation of Amari Boone's constitutionally protected liberty and privacy interests.

117.    By the actions and inactions of the State and state officials set out in this Complaint, Amari Boone was subjected to a continuing risk of and was deprived of the substantive due process rights conferred on him by the Fourth Amendment to the United

States Constitution, including the right to be reasonably safe from harm while in government custody and the right to receive care, treatment, and services determined and provided through the exercise of accepted professional judgment.

### Count Eight
### Gross Negligence Against All Defendants

118.    Plaintiffs' gross negligence claim is based on the facts set out in this Complaint.

119.    Amari's parents aver that the conduct of Defendants as set forth above constitutes gross negligence as the law defines those terms. Defendants were consciously aware of an extreme degree of risk conduct posed to Amari Boone and other children in community-based care, but they nevertheless proceeded in failing to act to protect them in complete disregard for their rights, safety, and welfare.

120.    For this gross negligence, Plaintiffs as individuals and in their representative capacities specifically plead for the recovery of exemplary damages as set forth below.

### AGENCY

121.    At all relevant times, Shelia Roberson, Chaisity Frida–Caro, and Jalah Lawrence were in the course and scope of their employment with or acting as agents of ACH Family Services such that it is liable for the conduct of those employees or agents.

122.    At all relevant times, employees of CK Family Services were in the course and scope of their employment with or acting as agents of CK Family Services such that it is liable for the conduct of those employees or agents.

123.    At all relevant times, Governor Greg Abbott, in his official capacity was in control

of and responsible for the actions of DFPS, state officials, state employees, and those

contracted with the state to provide services to Amari Boone while in the State's custody.

## **DAMAGES**

124.    Pursuant to TEXAS CIVIL PRACTICES & REMEDIES CODE § 71.021, in their capacity as

representatives of the Estate of Amari Boone, Ariana George and Rodney Boone seek

damages including, but not limited to, the following:

   a.  Pain and suffering,

   b.  Mental anguish,

   c.  Physical disfigurement,

   d.  Medical care expenses, and

   e.  Funeral expenses.

125.    Pursuant to TEXAS CIVIL PRACTICES & REMEDIES CODE § 71.002, Ariana George is a

wrongful death beneficiary as the surviving mother of Amari Boone. In that capacity, she

seeks damages including, but not limited to, the following:

   a.  Past and future mental anguish,

   b.  Loss of companionship and society, and

   c.  Funeral expenses.

126.    Pursuant to TEXAS CIVIL PRACTICES & REMEDIES CODE § 71.002, Rodney Boone is a

wrongful death beneficiary as the surviving father of Amari Boone. In that capacity, he

seeks damages including, but not limited to, the following:

   a.  Past and future mental anguish,

      b.     Loss of companionship and society, and

      c.     Funeral expenses.

127.   Pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, Plaintiffs seek from Defendant Greg Abbott (in his official capacity) reasonable costs and expenses, including reasonable attorneys' fees, for prosecution of their causes of action alleged against him in his official capacity.

128.   Plaintiffs' damages exceed the minimal jurisdiction of this Court, and Plaintiffs ask for full recovery of such damages following a trial by jury.

## EXEMPLARY DAMAGES

129.   Ariana George and Rodney Boone, individually and as representatives of the Estate of Amari Boone, allege that each and every act or omission of Defendants and their agents described in this Complaint, when viewed objectively from the standpoint of policymakers, involved an extreme degree of risk, considering the probability and magnitude of the physical harm to others and that Defendants had actual subjective awareness of the risks involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Amari Boone and other children in community-based care.

130.   As such, Defendants' conduct amounts to gross negligence or malice, as those terms are defined by law, so as to give rise to an award of exemplary or punitive damages, for which Ariana George and Rodney Boone, individually and in their representative capacities, now pleads against Defendants. Further, by reason of such conduct, Ariana

George and Rodney Boone, individually and in their representative capacities, are entitled to and therefore assert a claim for punitive and exemplary damages in an amount sufficient to punish and deter Defendants, and others like Defendants, from such conduct in the future.

131.    Additionally, each of the malicious and fraudulent acts of Defendants independently give rise to an award of exemplary or punitive damages, for which Plaintiffs now pleads against Defendants in an amount sufficient to punish and deter Defendants, and others like Defendants, from such conduct in the future.

## DEFENDANTS ARE LIABLE FOR UNCAPPED EXEMPLARY DAMAGES

132.    The limitation on recovery of exemplary damages relating to criminal acts of another imposed by TEXAS CIVIL PRACTICES & REMEDIES CODE § 41.005 does not apply to this case.

133.    At all relevant times, ACH Family Services' employees committed criminal acts, ACH Family Services authorized the doing and manner of those criminal acts, employees Chaisity Frida–Caro and Jalah Lawrence were employed in managerial capacities and acting within the scope of their employment. Additionally, and alternatively, ACH Family Services or managers Chaisity Frida–Caro and Jalah Lawrence ratified and/or approved the acts of Shelia Roberson which violated TEXAS PENAL CODE § 22.04.

134.    Further, the limitation on the amount of exemplary damages set out in TEXAS CIVIL PRACTICES & REMEDIES CODE § 41.005 does not apply in this case because Plaintiffs seek

exemplary damages based on conduct described as a felony pursuant to TEXAS PENAL CODE § 22.04.

135.   Plaintiffs request prejudgment and post-judgment interest in accordance with the maximum legal interest rates allowable as interpreted under the law.

## REQUEST FOR A JURY TRIAL

136.   Plaintiffs demand a jury trial on all issues so triable and contemporaneously with the filing of this Complaint submits the applicable fee.

## PRAYER

Ariana George and Rodney Boone, individually and as representatives of the Estate of Amari Boone, ask that Defendants are served with citation directing them to appear and answer this Second Amended Complaint and Jury Demand. They further ask the Court to enter a judgment awarding her damages, costs of court, prejudgment and post-judgment interest, and any further relief to which they may be justly entitled after the final determination of the causes of action set out above.

Respectfully Submitted,

_____

Russell T. Button
State Bar No. 24077428
Russell@buttonlawfirm.com
Ashley D. Washington
State Bar No. 24102030
Ashley@buttonlawfirm.com
THE BUTTON LAW FIRM

4315 West Lovers Lane, Suite A
Dallas, Texas 75209
Telephone: 214-888-2216
Facsimile: 214-481-8667

Heather Lynn Long
State Bar No. 24055865
heather@heatherlonglaw.com
**HEATHER LONG LAW PC**
4310 N. Central Expressway
Dallas, Texas 75206
Telephone:  214-699-5994

Brent W. Chandler
State Bar No. 24055291
brent@chandlerrosslaw.com
John A. Ross, Jr.
State Bar No. 24053453
tony@chandlerrosslaw.com
**CHANDLER │ ROSS, PLLC**
110 N. Woodrow, Ste. 120
Denton, Texas 76205
Telephone: 940-800-2500
Facsimile: 866-464-8315

**ATTORNEYS FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

Plaintiffs served a true and correct copy of this First Amended Complaint and Jury Demand on Defendants through the Court's e-filing system on October 11, 2022.


_____

Russell T. Button